UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


PETER DALSGAARD,

      Plaintiff,

v.                                    CASE NO.: 8:11-cv-2204-T-23TGW

DENISE MONTOYA,

      Defendant.

_____/


## <u>ORDER</u>

A father petitions under the Hague Convention to return his eight-year-old

daughter to Denmark, which is the father's residence, the daughter's habitual residence,

and the situs of the marriage, the divorce, and the creation and enforcement of the

custody rights at issue.  The custodial arrangement in force in Denmark permitted serial

visits by the daughter to the mother in the United States during the summer of 2011.  At

the conclusion of the last in the series of visits, the daughter "refused" to return to

Denmark with the father, who had flown to Tampa to receive his daughter and to

accompany her on her return home.

Protective of the well-being and tranquility of an affected child, the Hague

Convention intends the resolution of a dispute to occur as swiftly as informed

deliberation permits and to restore the child to the jurisdiction of the child's habitual

residence for the resolution of a child custody issue, excepting only a few, carefully

delineated circumstances, none of which applies in this case.  After filing of the father's petition, a hearing was promptly scheduled, and a day-long hearing occurred, at which both parents and an "expert" testified.

Because a controversy of this nature inevitably compels the presiding officer to confirm that the correct statutory result accords with the best interests of the affected child, an in camera interview of the child occurred (in the presence of only the district judge, the judge's judicial assistant, and a law clerk).  As a result of that interview, I find by clear and unmistakable evidence that this delightful, bright (fluent in three languages), courageous child is a typical eight-year-old who loves both of her parents and wants neither to decide between them nor to disappoint either of them but wants them to stop fighting.  The child agreed that she would rather the court decide her immediate residence and confirmed that she will be fine either way.  She persisted in saying (in a somewhat unconvincing and desultory manner) that she wanted to stay with her mother, but she gave only one reason.  She said she was mad with her father for letting his pregnant girlfriend "move in" with him "too soon," although she could not say how soon was "too soon."  She said that her mother agreed that the girlfriend "moved in" too soon.  However, when asked about her relations with the girlfriend, the child expressed a fondness for the girlfriend and a comfort with her and confirmed that she would like to be in Denmark when the brother is born.  She misses her friends in Denmark.  Based upon the interview, I find as matter of fact that during her visits during the summer of 2011 the child has acquired from the mother her stated view of the relation of the father and the girlfriend and that the child neither believes the view is important nor will renounce the view affirmatively.  This is the submission of an eight-

year-old to a parent, a submission that is typical, ephemeral, superficial, and not

consequential in a determination of custody in a Hague Convention case.

I am entirely comfortable returning this immensely pleasing and endearing child to

her habitual residence for a resolution of the current mess, which is only made worse by

delay or dithering.  A more detailed explanation follows.

### DISCUSSION

Eight-year-old D.S.D. has lived in Denmark since infancy.  Her parents, Peter

Dalsgaard and Denise Montoya, are divorcing – in Denmark.  The parents share joint

custody of D.S.D., and under Danish law parents with joint custody must each consent

to a child's remaining abroad.  A March, 2011, agreement signed by both parents allows

D.S.D. to visit Montoya, who moved to the United States after the separation, from

June 25, 2011, until August 1, 2011.  On August 1st Dalsgaard flew to Tampa, Florida,

to accompany his daughter during her return to Denmark in accord both with the

agreement and with Danish law.  D.S.D. refused to return with her father; the

preponderant evidence suggests Montoya and her family assented to, and perhaps

fueled and encouraged, D.S.D.'s resistence.  Dalsgaard returned to Denmark and

gained full temporary custody of D.S.D. from the pertinent Danish authority.  On

September 28, 2011, Dalsgaard petitioned this court for D.S.D's return to Denmark

under the Hague Convention on the Civil Aspects of International Child Abduction

("Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343

U.N.T.S. 89, as implemented by the International Child Abduction Remedies Act

("ICARA"), 42 U.S.C. §§ 11601-11.  A final evidentiary hearing occurred on October 20,

2011, at the end of which the court orally ordered D.S.D. returned to Dalsgaard and to Denmark on Tuesday, October 25, 2011, and stated that a written opinion would follow.

Signed by both the United States and Denmark, the Hague Convention aims to remedy (and prevent) international removal or retention of children in violation of custody rights established in a signatory state.  See Art. 1(a-b).  As Judge Kozinski explains, the Convention:

> was not drafted in response to any concern about violent kidnappings by strangers.  It was aimed, rather, at the unilateral removal or retention of children by parents, guardians or close family members.  Such an abductor rarely seeks material gain; rather, he or she will aspire to the exercise of sole care and control over a son or daughter in a new jurisdiction.  The preamble of the Convention describes the signatory states as "desiring to protect children internationally from the harmful effects of their wrongful removal or retention," effects which are thought to follow when a child is taken out of the family and social environment in which its life has developed.  This may occur either through the removal of a child from its habitual environment, or by a refusal to restore a child to its own environment after a stay abroad.

Mozes v. Mozes, 239 F.3d 1067, 1069-70 (9th Cir. 2001) (Kozinski, J.) (citations and most quotations omitted).  In the quintessential case, the Hague Convention mandates the expeditious reversal of a wrongful removal or retention in order to prevent a forum-shopping parent from deracinating a child.

Excluding a few narrow exceptions, a child returns home to a petitioner who shows by a preponderance of the evidence that the child is "wrongfully" removed or retained.  Pielage v. McConnell, 516 F.3d 1282, 1286 (11th Cir. 2008).  Under Article 3 of the Convention, a child is "wrongfully" removed or retained if the child's remaining in one country violates a custody right vested in, and exercised by, a party in another country that is the "habitual residence" of the child.  A child almost always must return to

her "habitual residence" so that her home country may determine custody.  See Abbott v. Abbott, 130 S.Ct. 1983, 1989, 1995-96 (2010).  Hence, a petition under the Convention does not determine custody; a petition under the Convention determines who determines custody.  See Shalit v. Coppe, 182 F.3d 1124, 1128 (9th Cir. 1999).  Unsurprisingly, "'[h]abitual residence' is the central – often outcome determinative – concept on which the entire system is founded."  Mozes, 239 F.3d at 1072.

A "habitual residence" is "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has 'a degree of settled purpose' from the child's perspective."  Karkkainen v. Kovalchuk, 445 F.3d 280, 291-92 (3d Cir. 2006); Koch v. Koch, 450 F.3d 703, 711 (7th Cir. 2006) ("a child [] wrongfully removed . . . is taken out of the family and social environment in which [her] life has developed").  However, "a parent cannot create a new 'habitual residence' by the wrongful removal and sequestering of a child," Diorinou v. Mezitis, 237 F.3d 133, 142 (2d Cir. 2001), because "[t]hat would invite abduction."  Kijowska v. Haines, 463 F.3d 583, 587 (7th Cir. 2006).  In an easy case – that is, a case in which the child's "new" residence is plainly not her "habitual residence" – "the initial translocation from an established habitual residence [i]s clearly intended to be of a specific, delimited period."  Ruiz v. Tenorio, 392 F.3d 1247, 1253 (11th Cir. 2004) (quoting Mozes, 239 F.3d at 1076-77).

For good reason, Montoya exerts no effort arguing that D.S.D.'s "habitual residence" is the United States.  Exclusive of vacations, nearly the whole of D.S.D's life has transpired in Denmark.  Until Montoya wrongfully retained her, D.S.D. never attended school outside Denmark.  Dalsgaard testified (persuasively, given both the

facts and D.S.D.'s behavior before the court) that D.S.D. enjoys a "rich social life" in Denmark.  Much of D.S.D.'s family lives in Denmark (for example, eleven cousins).  Further, the record is full of letters from friends and family in Denmark attesting to Dalsgaard's excellence as a father.  (Pet. Ex. 14)  Montoya concedes that, at least before the separation, Dalsgaard was "the center of the universe" to D.S.D.

Dalsgaard and Montoya never discussed permanently re-locating D.S.D. to the United States, and "in the absence of settled parental intent" to move a child a claim that "an earlier habitual residence has been abandoned" warrants great skepticism.  Ruiz, 392 F.3d at 1255 (quoting Mozes, 239 F.3d at 1079).  The March, 2011, agreement, titled "Agreement on Custody, Place of Residence, and Contact" in Dalsgaard's translation and "Agreement for Parental Authority and Custody" in Montoya's, states (now quoting Montoya's translation), "[D.S.D.] lives with Peter Dalsgaard and, therefore, Peter Dalsgaard is considered to be [D.S.D.]'s custodial parent."  (Res. Ex. 4)  The agreement allows Montoya to see D.S.D. in the United States for two weeks in April, 2011, for ten days in May and June, 2011, and, finally, from June 25 until August 1, 2011.  Each visit ended on a stated day and was therefore "intended to [last] a specific, delimited period."  Ruiz, 392 F.3d at 1253.  The agreement's statement that D.S.D. "lives with" Dalsgaard and the agreement's enumeration of precisely limited visits to the United States shows an "absence of settled parental intent" to establish the United States as a new "habitual residence."  D.S.D. lived and attended school only in Denmark and the parents lacked a shared intent that D.S.D. live anywhere else.  The question of "habitual residence" is not a close question.

Nor can Montoya argue with any success that no retention occurred.  "[T]he term 'retention' is meant to cover the circumstances where a child has been prevented from returning to h[er] usual family and social environment."  Pielage, 516 F.3d at 1288.  A "retention" began when without Dalsgaard's consent Montoya kept D.S.D. in the United States and away from "her usual family and social environment" after August 1st.

Montoya protests that no "intentional" or "overt"  retention occurred because she merely acquiesced to D.S.D.'s desire to remain.  Although whether the retention is intentional is not controlling under the Convention, Montoya signed an agreement under which her eight-year-old was due back in Denmark on August 1st.  The record is devoid of evidence that Montoya insisted or even urged D.S.D. to return to Denmark – certainly nothing suggests that Montoya attempted to enforce the agreement with the persistence, authority, and persuasion typifying the responsible parent of an eight-year-old.  The Convention grants Montoya no presumption of neutral (let alone pristine) motivation:

> The object of the Convention is to dissuade parents . . . from engaging in gamesmanship with a child's upbringing in order to secure an advantage in an anticipated custody battle.  Permitting evidence of acclimatization to trump evidence of earlier parental agreement could open the children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit.

Gitter v. Gitter, 396 F.3d 124, 134 (2d Cir. 2005) (citing Mozes, 239 F.3d at 1079).  The most plausible story is the common one; a "usual" Hague Convention case "involve[s] the non-custodial parent . . . retaining the child after a permitted visitation period has ended."  Pielage, 516 F.3d at 1287.

The retention that began August 2nd was "wrongful" under the Convention. Again, this is a typical case. The Pérez-Vera Report ("recognized by the [Hague] Conference as the official history and commentary on the Convention," <u>Ruiz</u>, 392 F.3d at 1251 n.2) states that:

> 'wrongfully retained' is meant to cover those cases where the child, with the consent of the person who normally has custody, is in a place other than its place of habitual residence and is not returned by the person with whom it was staying. This is the typical situation which comes about when the removal of the child results from the wrongful exercise of access rights.

Elisa Pérez-Vera, <u>Explanatory Report on the 1980 Hague Child Abduction Convention</u>, 3 Acts and Documents of the 14th Session, ¶ 57 (1982). The report contemplates that the child is properly "returned by" the adult; not "released" or "relinquished" or "ceded." A retention is not "wrongful" because of an abductor's intentions; a retention is "wrongful" because of a violation of a custody right in the child's habitual residence. D.S.D.'s habitual residence is Denmark, and the question is whether Montoya retained D.S.D. in contravention of Danish law.

Under Chapter 1, Section 3 of the Danish Act on Parental Responsibility:

> (1) If the parents have joint custody, they must agree on significant decisions regarding the child. The parent with whom the child lives can make decisions about general day-to-day matters relating to the child, including where in Denmark the child will have his or her habitual place of residence.
>
> (2) If the parents have joint custody but disagree about the custody, they both have to give their consent for the child to leave the country . . . . They also have to give their consent if the child's stay abroad . . . is extended beyond the agreed, presumed, or specified duration, unless an agreement has been made according to section 17(1) . . . .

(Doc. 1, Ex. G) (The English translation is a courtesy of the Danish Department of Family Affairs.[*])  Under Chapter 3, Section 17, "(1) If the parents have joint custody and disagree about which parent the child should live with, the court will decide the matter . . . . (2) The court can change an agreement or a decision about a child's place of residence."  A letter from the Department of Family Affairs to the State Department confirms that under Danish law "[b]oth parents must [] consent if a child's stay in a foreign country is extended beyond what is decided or agreed."  (Pet. Ex. 20)

Dalsgaard and Montoya's March, 2011, agreement declares joint custody and provides that D.S.D. will visit the United States for "specified duration[s]."  Unless a Danish court orders otherwise, Danish law requires that Dalsgaard consent before D.S.D. remains outside Denmark for longer than the "agreed, presumed, [] specified duration."

To defend her retention of D.S.D., Montoya stands on the following passage of the agreement (Montoya's translation):

> [I]t has been agreed that the parties at the latest on June 28, 2011 re-evaluate the present agreement concerning how it should continue.  The basis for whether the agreement continues is whether or not [D.S.D.] is happy with living in Denmark and visiting Denise in the U.S.  It has furthermore been agreed that revision of the agreement will take place in the U.S., since all parties are gathered in the U.S. at the agreed upon time, to revise the agreement.  Both parties have the right to demand a revision of the agreement before June 28, 2011, if [D.S.D.] is unhappy.

---

[*] See Familiestyrelsen, Legislation and Rules, http://www.familiestyrelsen.dk/en/englishversion/legislationandrules/ (last visited Oct. 22, 2011); Hague Convention, Art. 14 (permitting direct judicial notice of the law of the habitual residence).

(Res. Ex. 4)  Even with the most generous reasonable interpretation of the passage in her favor, nothing in the agreement or in the law supports Montoya's egregiously faulty assumption, which is that D.S.D.'s habitual residence defaults to the country where D.S.D. is present at the moment the agreement dissolves.  Dalsgaard agreed to consider a new arrangement on June 28th or, if D.S.D. was unhappy, earlier.  If Dalsgaard objected to a proposed new arrangement, Montoya could not keep D.S.D. in the United States in violation of Chapter 1, Section 3(2) of the Danish Act on Parental Responsibility.  (That the parties agreed to negotiate in the United States is, of course, immaterial; the agreement states that the parties chose a convenient location, not a legally significant location.)  In the absence of an operative agreement, the law of D.S.D.'s habitual residence governs, and Montoya patently broke that law.  Her argument is that possession is nine-tenths of the law, but that argument the Hague Convention precisely forecloses.  See, e.g., Abbott, 130 S.Ct. at 1995-96; Hanley v. Roy, 485 F.3d 641, 644 (11th Cir. 2007); Vale v. Avila, 538 F.3d 581, 583 (7th Cir. 2008).

In addition, the rest of the agreement supports Dalsgaard.  That the agreement sets August 1, 2011, as the required end of D.S.D.'s third visit to the United States confirms that the agreement would continue to operate (including that D.S.D. would continue to "live with Peter Dalsgaard") if the parents reached no mutual agreement during the "re-assessment."

Montoya's retention of D.S.D. obviously violates Danish law.  A Danish state administration (Pet. Ex. 21) granted Dalsgaard temporary full custody, which further proves that Montoya retains D.S.D. in violation of the law of D.S.D.'s habitual residence.

Also, Dalsgaard applied for temporary full custody on August 2nd, the day that Montoya's wrongful retention of D.S.D. began.  Not that Montoya challenged the point, but the order confirms that Dalsgaard unquestionably exercised his custody rights when the wrongful retention began.

Wrongfully retaining her daughter, Montoya can only attempt to plead one of the narrow exceptions in Articles 12 and 13 of the Convention.  See Baran v. Beaty, 526 F.3d 1340, 1345 (11th Cir. 2008) ("[t]he[] affirmative defenses are [] narrowly construed to effectuate the purpose of the Convention"); Baxter v. Baxter, 423 F.3d 363, 368 (3d Cir. 2005).  Attempting to establish either of two exceptions, Montoya claims that Dalsgaard consented to the retention and that D.S.D. "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [her] views."

Montoya's argument that Dalsgaard consented to the retention requires no attention because the only evidence of consent under the Hague Convention is the evidence that fails to show consent under Danish law, namely, the "re-assessment" provision of the March, 2011, agreement.  The one difference is the burden of proof; under Article 13 of the Hague Convention and ICARA, Montoya must demonstrate consent by a preponderance of the evidence.  42 U.S.C. § 11603(e)(2).  No evidence shows that Dalsgaard consented under Danish law to D.S.D.'s move to the United States.  (Neither party argues that the meaning of "consent" differs under the Hague Convention and under Danish law.  Which is fine – Dalsgaard conveyed not a hint of "consent" to D.S.D.'s retention under any conceivable definition.)

That leaves D.S.D.'s state of mind and "degree of maturity."  The burden is again

Montoya's by a preponderance of the evidence, though even if D.S.D. is mature and

objects to return, application of the exception is not mandatory:

> This discretionary aspect of Article 13 is especially important
> because of the potential for brainwashing of the child by the alleged
> abductor.  A child's objection to being returned may be accorded little
> if any weight if the court believes that the child's preference is the
> product of the abductor parent's undue influence over the child.

Department of State, Hague International Child Abduction Convention; Text and Legal

Analysis, Pub. Notice 957, 51 Fed. Reg. 10494-01, 10509-10 (1986); see also de Silva

v. Pitts, 481 F.3d 1279, 1285-86 (10th Cir. 2007); Pérez-Vera, supra, ¶ 30.  Conversely,

even if undue parental influence is not present and a child volunteers reasons for

wanting to stay, a child must demonstrate sufficient maturity.  For example:

> That [a child] has maintained her friendships with children in
> America, prefers America to [her habitual residence], and now enjoys
> a "situation that has stabilized" does not establish that she is mature
> enough for a court appropriately to consider her views on where she
> would prefer to live under the Hague Convention.

England v. England, 234 F.3d 268, 272 (5th Cir. 2000); see also Tsai-Yi Yang v. Fu-

Chiang Tsui, 499 F.3d 259, 279 (3d Cir. 2007).  Obviously, not every eight-year-old

possesses the maturity to articulate a settled view entitled to deference.  See Simcox v.

Simcox, 511 F.3d 594, 604 (6th Cir. 2007) (affirming the district court's finding that a

child was "preoccupied, disinterested and detached; in short, a typical eight year old boy

who strongly desired to be anywhere but in a Judge's chambers answering questions").

Before the evidentiary hearing, an hour and twenty minute in camera interview of

D.S.D. transpired; no lawyers and no parents.  Although a vibrant, cheerful, and

delightful guest in chambers, D.S.D. when questioned had little to say about her

parents' dispute.  D.S.D. expresses in head nods and one-word sentences a preference to remain in the United States.  Her reticent and laconic responses (she had plenty to say about other matters) leave the depth and sophistication of her conviction, and the maturity behind her conviction, highly doubtful.  Contributing to this doubt, Montoya concedes that D.S.D. is "in a lot of turmoil right now" and "has to digest a lot of things." Montoya admits also that D.S.D.'s desire to remain in the United States waivers.

Dalsgaard asserts that D.S.D.'s preference to remain in the United States is the product of Montoya and her family's influence.  Montoya denies that D.S.D. experienced untoward manipulation.  Based on her testimony, however, Montoya conspicuously failed to explain to D.S.D. that D.S.D. was <u>supposed</u> to return to Dalsgaard on August 1st.  Indeed, the evidence suggests that Montoya allowed a belief to fester in D.S.D. that returning to Denmark betrays Montoya.  This is not to say that Montoya intended to manipulate D.S.D. or that Montoya tried to "poison" D.S.D.'s view of Dalsgaard.  The point is, even if Montoya inflicted no "undue" influence, D.S.D. behaves as if she believes she must elect between her parents, and her unenviable position obviously agonizes her.  Head nods and monosyllables in favor of the status quo – an eight-year-old's best effort at a balance of terror – is the closest D.S.D. can get to appearing to favor neither parent.  (One of D.S.D.'s few questions while in chambers was where she would sit once in the courtroom.  Relieved to learn that she could sit where she liked, she encamped equally and safely distant from her parents.)

The sentiments of a perspicacious district judge addressing a Hague Convention petition for a ten-year-old boy resonate:

> [The child] spoke with me in chambers outside the presence of counsel and his family.  That experience only serves to underscore the wrenching pain of custody disputes and causes me to question the wisdom of allowing this difficult issue to be decided upon the wishes of a child – at least one this young.
> . . . .
>
> A reading of the record might justify a conclusion that an obviously intelligent young man of still tender age has a maturity which justifies giving weight to his views.  But the dry record does not disclose the tears coursing down the ruddy cheeks of a brave boy who was put in a difficult, if not impossible, position.
> . . . .
>
> I certainly sympathize with [the child's] difficult position.  He doesn't want to leave his mother . . . . Forcing a child to choose between parents may be the ultimate Hobson's choice, particularly when massive geographic or cultural difference separate the parents.  I decline to impose that responsibility on this youngster.

In re Robinson, 983 F.Supp. 1339, 1343-44 (D. Colo. 1997) (Miller, J.).

Although ostensibly directed at D.S.D.'s state of mind and maturity, most of Montoya's evidence is germane only to a custody determination.  Montoya devoted much effort to fleshing out D.S.D.'s potential reasons for wanting to stay – an attempt to hold a custody hearing by another name.  Most prominently, the parents wished to fight over Dalsgaard's new (pregnant) girlfriend and over D.S.D.'s perception of that girlfriend.  But the clashing testimony and the dueling letters from family and friends, apart from largely canceling each other, are of no moment.  To matter in resolving this Hague Convention petition Dalsgaard's girlfriend would have to pose a danger to D.S.D.  To the contrary, D.S.D. is not afraid of the girlfriend, who in fact treats D.S.D. well by D.S.D.'s own account.

Unfortunately, a word is due on Montoya's "expert," who in his effort to answer questions in a manner congenial to his client managed only confusion and incongruity.

The expert's report states that D.S.D. is a "very mature and wise girl who appears capable of making her own decisions." (Res. Ex. 6)  Cross-examined, the expert added that D.S.D.'s "view of this situation is a very naive and a very innocent one."  The report concludes that D.S.D. is "capable of making her own decisions based on her own perceptions of her world around her."  At the hearing, the expert clarified that D.S.D. fails to grasp that her custody proceedings impact her.  The report claims that a return to Denmark "certainly will be very detrimental for [D.S.D.'s] well being."  Yet at the hearing the expert speculated both that D.S.D. functioned "at a high level" in Denmark and that D.S.D. will overcome "all these issues."  The expert testified that D.S.D. is upset that Dalsgaard's girlfriend is pregnant, but, pressed to elaborate the upset, the expert failed to state a single specific question he asked D.S.D. about the pregnancy or the girlfriend.  In short, the expert had many (often conflicting but always congenial to his employer) opinions and few reasons.  The only adults in D.S.D.'s life with whom the expert interacted are Montoya and Montoya's lawyer.  A letter from Montoya's lawyer informed the expert that D.S.D. is upset that Dalsgaard's girlfriend is pregnant and that Dalsgaard accuses Montoya of manipulating D.S.D.'s opinion. (Res. Ex. 7)  The expert's testimony leaves the distinct impression that the letter, not D.S.D., guided the expert's views, which receive neither weight nor even credit from the finder of fact.

## CONCLUSION

The Convention stands on a conviction that the custody of a child is best decided at the child's habitual residence.  Abbott, 130 S.Ct. at 1995.  D.S.D.'s distressing story reifies that conviction and fully justifies this order to return, which is an elementary observation of the Convention.  Accordingly, the petition (Doc. 1) is **GRANTED**.  On

October 25, 2011, D.S.D. shall leave the United States with Dalsgaard on flight SK3948

from Miami to Washington D.C. and flight SK926 from Washington D.C. to

Copenhagen.

The clerk will close the case.

ORDERED in Tampa, Florida, on October 24, 2011.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE